**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CORUS BANKSHARES, INC.[1] | ) | Case No. 10-26881 (PSH) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF RANDY P. CURTIS**
**IN SUPPORT OF FIRST DAY PLEADINGS**

1.      My name is Randy P. Curtis.  I am over the age of 18 and am competent to testify. I am President and Chief Executive Officer of Corus Bankshares, Inc. (the "Debtor").  In that capacity, I direct the Debtor's financial operations, including strategic operations, planning, and forecasting.  I am a member of the company's senior management team and I am familiar with the Debtor's day-to-day operations, business affairs, and books and records.  The Debtor presently operates a real estate mortgage loan management business.

2.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtor's management and the Debtor's advisors.  I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1]     The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Corus Bankshares, Inc. (3592).  The location of the Debtor's corporate headquarters and the service address for the Debtor is: 10 S. Riverside Plaza, Suite 1800, Chicago, IL  60606.

# I.

## THE DEBTOR'S HISTORY, BUSINESS, AND CAPITAL STRUCTURE

3.      Prior to the date hereof (the "Petition Date"), the Debtor was a bank holding company registered under the Bank Holding Company Act of 1956.  The Debtor's wholly-owned federally-chartered banking subsidiary, Corus Bank, N.A. (the "Bank"), was primarily focused on commercial real estate lending, deposit gathering, and servicing the check cashing industry.  As of June 30, 2009, the Bank had total assets of $7 billion and total deposits of approximately $7 billion.   Because the Bank's loan portfolio was concentrated in loans secured by condominium projects under construction, the Bank was severely impacted by the collapse of the housing market in 2008 and 2009.  The continued weakening of the housing and credit markets and of the general economy contributed to increased levels of nonperforming assets, charge-offs, and credit loss reserves.

4.      As a result of these escalating problems related to the Bank's loan portfolio and financial condition, on Friday, September 11, 2009 the Bank was closed by the Office of the Comptroller of the Currency ("OCC"), and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver of the Bank.  To protect the Bank's depositors, the FDIC entered into a purchase and assumption agreement with MB Financial Bank, N.A. to assume all of the deposits of the Bank.  Subsequently, the FDIC agreed to sell the majority of the Bank's remaining assets to a consortium managed by Starwood Capital Group.  On September 14, 2009, Nasdaq halted trading in the Debtor's common stock, due to concerns about the Debtor's ability to sustain compliance with all of the requirements for continued listing on the exchange.  The Debtor's common stock, however, continues to trade on the over-the-counter market.

K&E 16718176

5.      Due to the closure of the Bank, the Debtor's investment in the Bank has become effectively worthless.  As of June 15, 2010, the Debtor had approximately $314 million in assets and $533 million in liabilities.  The Debtor currently employs 5 people.

6.      Since the closure of the Bank, the Debtor has continued to operate in a reduced capacity.  The Debtor's current operations include among other things:  (a) ongoing management of certain loan participations; (b) pursuit of tax refunds relating to the worthless stock deduction resulting from FDIC seizure; (c) evaluating prospective investment opportunities and engaging in discussions and negotiations with the Debtor's creditors, other stakeholders, and potential investors; and (d) complying with public company and other reporting requirements.  The Debtor has commenced this chapter 11 case in an effort to maximize value for its stakeholders.

A.      **The Debtor's Prepetition Capital Structure**

7.      The Debtor's prepetition capital structure included:  (a) 53.7 million shares of common stock; and (b) trust originated preferred securities ("TOPrS").  The holders of the Debtor's TOPrS are the Debtor's major group of creditors.

8.      TOPrS are hybrid securities, possessing characteristics of both debt and equity.  Given certain regulatory and tax advantages, TOPrS have been a preferred method for certain bank holding companies, such as the Debtor, to raise capital.

9.      In all, between June 2003 and June 2007, the Debtor created thirteen unconsolidated subsidiary trusts (the "Trusts"), each of which issued securities (the "Trust Preferred Securities") to investors and then used the proceeds of the issuance to purchase subordinated debentures (the "Subordinated Debentures") from the Debtor with terms essentially identical to the TOPrS.  The Subordinated Debentures were structured as floating rate junior

3

subordinated notes on the Debtor's balance sheets.  The investors received quarterly dividend payments and the promise that their principal would be repaid.

10.    The Debtor could defer quarterly interest payments under the Subordinated Debentures (and consequently on the Trust Preferred Securities) for twenty consecutive quarters.[2]  On November 18, 2008, the Debtor began to defer interest on the Subordinated Debentures.

11.    As of June 15, 2010, there remain outstanding under the Subordinated Debentures approximately $392.5 million of principal and approximately $24.1 million of deferred interest.

## II.

## EVENTS LEADING TO THE CHAPTER 11 FILING AND THE PLAN SPONSOR

12.    After the Bank was closed, the Debtor continued to pay its debts as they became due (while continuing to defer quarterly interest payments due under the Subordinated Debentures).  The Debtor's management, Board, and advisors also engaged in an extensive analysis to determine how best to maximize the Debtor's value for the benefit of its stakeholders. Among other things, the Debtor and its financial advisors engaged in an extensive marketing process to identify potential sponsors of a chapter 11 plan of reorganization.  That process continues.  The Debtor also communicated with, and provided information to, the TOPrS indenture trustees and advisors about its marketing process and strategic planning.  The Trustees have been generally supportive of the Debtor's process and efforts to maximize value. Ultimately, the Debtor determined that it was appropriate to continue its restructuring efforts under the protection of chapter 11.

---

[2]    During the deferral period the Debtor is precluded from, among other things, declaring or paying any dividends to common shareholders or repurchasing its common stock.

**III.**

**THE FIRST DAY PLEADINGS**

13.     The Debtor has filed "first day" motions and applications (each, a "First Day Pleading") seeking relief intended to allow the Debtor to minimize disruption of the Debtor's business operations, thereby preserving and maximizing the value of the Debtor's estate.  Unless this "first day" relief is granted, I believe the Debtor's ability to maximize value for its stakeholders will be irreparably harmed.

14.     I am generally familiar with the contents of each First Day Pleading (including the exhibits thereto) described in further detail herein.  Based upon that general familiarity, information provided to me by other members of the Debtor's management team, and my colleagues who report to or provide information to me, I believe that the relief sought in each First Day Pleading:  (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.  Accordingly, I believe that failure to grant the relief described herein, taken as a whole, would immediately and irreparably harm the Debtor's business.

**Operations**

**B.      Motion of the Debtor for Entry of Interim Order Authorizing the Debtors to: (a) Continue Using its Existing Cash Management System, Bank Accounts, and Business Forms; and (b) Maintain its Existing Investment Practices (the "Cash Management Motion")**

15.     Under the Cash Management Motion, the Debtor seeks entry of an order granting the authority to:  (a) continue to use, with the same account numbers, its three bank accounts (the "Bank Accounts") in order to maintain the Debtor's Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtor as debtor in possession; (c) open new

5

debtor-in-possession accounts, if needed; (d) use, in their present form, all correspondence and business forms and other documents related to the Bank Accounts existing immediately before the date hereof, without reference to its status as debtor in possession; and (e) maintain its existing investment practices in the ordinary course of business, notwithstanding the provisions of section 345 of the Bankruptcy Code and the Trustee Guidelines.

16.    In addition, the Debtor further requests that the Court authorize the Debtor to make disbursements in the ordinary course of business by debit, wire, credit card, purchase card, automated clearing house ("ACH"), and other similar methods.  If the Debtor were not able to conduct transactions by debit, wire, credit card, purchase card, ACH, or other similar methods, I believe that the Debtor might be unable to perform under certain contracts, its operations would be unnecessarily disrupted and its estate would incur additional costs.  Indeed, certain federal and state taxing authorities require taxpayers to submit tax payments electronically through wire or ACH, and failure to do so would result in the imposition of penalties.

17.    The Debtor further requests certain relief vis-à-vis the Banks (as defined herein). The Debtor requests that the Court authorize and direct all Banks with which the Debtor maintains the Bank Accounts to continue to maintain, service, and administer such accounts on account of:  (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashiers' checks prior to the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtor was responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Cash Management System, if any.  In this regard, I believe that the Court should authorize and direct the Banks to

6

receive, process, honor, and pay any and all checks, wire transfer, credit card, ACH, and other instructions, and drafts payable through, drawn or directed on such Bank Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto; provided, however, that the Banks may honor any check, advice, draft, or other notification that the Debtor advised the Banks to have been drawn, issued or otherwise presented prior to the Petition Date only to the extent authorized by order of the Court.

18.     In the ordinary course of business, the Debtor utilizes an integrated, centralized Cash Management System, under which the Debtor disburses funds.[3]  The Debtor maintains three bank accounts at three different financial institutions (the "Banks"): JPMorgan Chase Bank ("JPM Disbursement Account"), Deutsche Bank Alex.Brown ("DB Holding Account"), and Deutsche Bank Trust Company Americas ("DB Trust Account," and collectively, with JPM Disbursement Account and DB Holding Account, the "Bank Accounts").

19.     Each of the Banks, pursuant to the applicable account services or other similar agreement, charges the Debtor fees related to the Bank Accounts and banking services performed by the Banks for the Debtor in connection with the Bank Accounts (the "Bank Fees").

20.     The Cash Management System supports operation of the Debtor's business.  The transfer of funds through the Debtor's Cash Management System is described below.

21.     The DB Trust Account is an interest-bearing money market account and holds most of the Debtor's cash.  Interest earned from the DB Trust Account is reinvested into the account.  DB Trust Account funds are invested in high quality AAA/Aaa or equivalent instruments, such as U.S. Treasury obligations or U.S. Government obligations.

---

[3]     Because the Debtor has no affiliates or related entities with which it shares bank accounts, all funds held in the Bank Accounts belongs to the Debtor.

7

22.     The DB Holding Account is an interest-bearing account and is the source of funds used in the JPM Disbursement Account.   When the Debtor writes checks or schedules disbursements to pay the operating expenses of the business, the Debtor's finance personnel transfer funds from the DB Holding Account to the JPM Disbursement Account, as needed, for any check or other transfer to be drawn from the JPM Disbursement Account.  The DB Holding Account commonly maintains a balance of approximately $1 million.   Any nominal interest earned from funds held in the DB Holding Account is deposited into the DB Holding Account.

23.     The JPM Disbursement Account is a zero balance account, meaning that funds are not retained in this account on a regular basis.  The JPM Disbursement Account is used to make payments drawn on the account by third party payees (*e.g*., employees, consultants, tax payments) including by check, debit card, ACH, or wire transfers.

24.     There is a single debit card connected to the JPM Disbursement Account.  The Debtor utilizes the debit card to make purchases of goods and services, such as office supplies and to pay cellular telephone bills.  Pursuant to the agreements governing the use of such debit cards, JP Morgan Chase Bank ("Chase") issues monthly invoices to the Debtor for debit card charges, and the Debtor makes periodic payments to Chase in payment of the invoices.

25.     I believe that, given the complexity of the Cash Management System, the burden of opening new bank accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks and business forms with a "Debtor in Possession" legend, would severely disrupt the Debtor's business, cause additional confusion, delay and cost at this critical time.

26.     It is my opinion that the relief requested in the Cash Management Motion is vital to ensuring the Debtor's seamless transition into bankruptcy.  Authorizing the Debtor to maintain

its Cash Management System will avoid many of the possible disruptions and distractions that could divert its attention from more critical matters during the initial days of the chapter 11 case.

27.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

**C.     Motion of the Debtor for Entry of an Order Authorizing the Debtor to: (A) Pay Certain Prepetition Wages, Salaries and Reimbursable Employee Expenses; (B) Pay and Honor Employee Benefits; and (C) Continue Employee Compensation and Employee and Retiree Benefit Programs (the "Wages Motion")**

28.     The Debtor requests that the Court grant certain relief intended to minimize the disruption to the Debtor's workforce resulting from the commencement of this case and thereby enhance the likelihood of a successful reorganization.  Specifically, the Debtor seeks entry of an order authorizing it, in its sole discretion, to pay prepetition claims, honor obligations, and to continue certain employee-related programs, in the ordinary course of business and consistent with past practice, relating to:  (a) Payroll Services, Unpaid Compensation, and Payroll Taxes; (b) Reimbursable Expenses; and (c) Employee Benefit Programs (collectively, the "Employee Obligations," each of which is defined below).  Additionally, the Debtors seeks entry of an order authorizing it, in its sole discretion, to pay prepetition claims related to Director Compensation (as defined below), if any.  As of the Petition Date, the Debtor estimates that it owes approximately $37,500 on account of the Employee Obligations.[4]  No prepetition wages, salaries, commissions, including vacation, severance, or sick leave pay owed to a particular Employee (as

---

[4]     As of June 15, 2010.

K&E 16718176

defined below) exceed the $11,725 priority cap imposed by section 507(a)(4) of the Bankruptcy Code.

29.     The Debtor currently employs 5 employees (the "Employees"), all of whom are paid on a salaried basis.  The Employees' valuable skill sets, institutional knowledge, and understanding of the Debtor's operations make them essential to the Debtor's ability to preserve the value of its business.

30.     Furthermore, just as the Debtor depends on the Employees to operate its business, the Employees depend on the Debtor for their livelihood.  The Employees would be exposed to significant financial hardship if the Court does not permit the Debtor to pay the prepetition wages and salaries owed to them in the normal course of business.

31.     The Debtor pays the Employees bi-monthly and by check.  The Debtor uses Automatic Data Processing, Inc. ("ADP") to process the payroll checks to the Employees and remit the appropriate withholding taxes.  On average, the Debtor pays approximately $200 per month to ADP for the payroll administration and other payroll-related services it provides to the Debtor (the "Payroll Services").  The Debtor estimates that it owes ADP approximately $100 on account of prepetition services.  The Debtor requests authority to continue to use ADP's payroll processing services and to pay any prepetition amounts that may be due to ADP.

32.     The Debtor estimates that, as of the Petition Date, it does not owe any funds on account of accrued wages, salaries, overtime, and other earnings earned prior to the Petition Date (the "Unpaid Compensation").   Nevertheless, some Employees may be entitled to Unpaid Compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and/or (b) some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking

10

system and, accordingly, have not been honored and paid as of the Petition Date. The Debtor requests authority, but not direction, to make payment of the Unpaid Compensation in the ordinary course of the Debtor's business.

33.     The Debtor maintains a board of directors comprising five independent directors (the "Directors"). The Directors receive flat-fee payments for meetings the Directors actually attend and additional compensation on account of committee-related responsibilities (the "Director Compensation"). As of the Petition Date, the Debtor estimates that it is current with respect to its Director Compensation obligations. Nevertheless, some Directors may be entitled to Director compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and/or (b) some checks issued to Directors prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date. The Debtor requests authority, but not direction, to make payment of Director Compensation in the ordinary course of the Debtor's business and to pay any outstanding prepetition amounts for unpaid Director Compensation that do not exceed the $11,725 cap imposed by section 507(a)(4) of the Bankruptcy Code.

34.     The Debtor is required by law to withhold from Employees' paychecks amounts related to federal, state and local income taxes, Social Security, and Medicare taxes, for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). In addition, the Debtor is required by applicable statutory authority to pay from its own funds Social Security, Medicare taxes, and additional amounts for federal and state unemployment insurance based on a percentage of gross payroll, (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").

11

35.     As of the Petition Date, the Debtor estimates that no Employer Payroll Taxes remain unpaid by the Debtor and that the Withheld Amounts have been collected from Employees' paychecks and have been transferred to the appropriate third parties.  Even if such Employee Payroll Taxes were owed, these Payroll Taxes constitute "trust fund" taxes and the payment of such taxes will not prejudice general unsecured creditors given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations and that such amounts are not property of the Debtor's estate. Furthermore, there is significant risk to the Debtor's officers of personal civil or criminal liability if the Payroll Taxes are not funded, which would severely impact this chapter 11 case by creating undue concern and distraction for such officers.  Out of an abundance of caution, the Debtor requests authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties and to continue to honor and process prepetition payments for Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

36.     In the ordinary course of business, the Debtor reimburses Employees or pays credit card invoices on behalf of Employees for certain approved, reasonable expenses incurred in the scope of their employment (collectively, the "Reimbursable Expenses").  Reimbursable Expenses are paid in connection with, among other things, business-related travel expenses, including meals, hotels, flights, car rentals, business development activities, and reimbursement for office supplies and other items purchased for use in the Debtor's business operations.

37.     The Debtor's Employees pay for the vast majority of the Reimbursable Expenses using a personal credit card.  In the aggregate, the Employees incur, on average, less than $18,000 per month in Reimbursable Expenses that are charged to their personal credit cards. Reimbursable Expenses are all incurred on the Debtor's behalf and with the understanding that

12

they will be reimbursed.  Accordingly, to avoid harming Employees who may have incurred the

Reimbursable Expenses, the Debtor requests authority, to be exercised in its sole discretion, to

(a) continue paying Reimbursable Expenses in accordance with prepetition practices, (b) modify

its prepetition policies relating thereto as the Debtor deems appropriate, and (c) pay all

Reimbursable Expenses that relate to the prepetition period and are submitted to the Debtor

postpetition.

38.     The Debtor provides its Employees, in the ordinary course of business, with:

(a) health benefits, including medical coverage, and dental care; (b) workers' compensation; and

(c) Vacation Time and other Leaves of Absence (collectively, the "Employee Benefit Programs,"

each of which is defined below).

39.     The Debtor offers the following medical and dental care plans to their Employees:

a.      **Medical Plan:**  The Debtor sponsors medical benefits for their
        Employees, provided by Aetna, Inc.  Such coverage costs the
        Debtor approximately $5,500 each month.  The plan offered
        by the Debtor is a Preferred Provider Organization plan
        ("PPO").

b.      **Dental Plan:**  The Debtor provides certain dental benefits for
        its Employees, provided by United HealthCare Services, Inc.
        Such coverage costs the Debtor approximately $600 each
        month.  If an Employee elects to participate under the
        Debtor's medical plan, the Employee and his or her
        dependents are automatically enrolled in the Debtor's dental
        plan at no additional cost.  If such Employee is not enrolled in
        the medical plan, he or she is not eligible to participate in the
        dental plan.

40.     The Debtor seeks authority, in its sole discretion, to (a) continue the medical and

dental plans for its Employees in the ordinary course of business, (b) continue making

contributions to the medical and dental plans, (c) pay any amounts related thereto, including on

account of any premiums, claim amounts, and administration fees to the extent that they remain

K&E 16718176

unpaid as of the Petition Date, and (d) modify such plans in its sole discretion in the ordinary course of its business.

41.     The Debtor provides workers' compensation insurance for its Employees at the level required by Illinois statute.  The Debtor maintains a fully-insured workers' compensation insurance policy (the "WC Policy") for its Employees.  The WC Policy operates to indemnify the Debtor for any loss in connection with workers' compensation claims.  The Debtor's carrier for its WC Policy is Hartford Fire Insurance Company ("Hartford").  The Debtor pays an annual premium to Hartford of approximately $7,500.  As of the Petition Date, all of the Debtor's Employees are insured under the WC Policy.  In addition, it is possible that an Employee may have a worker's compensation claim that accrued prepetition but was not submitted to the Debtor prior to the Petition Date.

42.     The Debtor seeks authority to continue and to modify, in the ordinary course of its business, such workers' compensation insurance.

43.     The Debtor provides vacation time to all Employees as a paid time-off benefit (the "Vacation Time").  The amount of Vacation Time available to a particular Employee and the rate at which such Vacation Time accrues is generally determined by the Employee's position and the length of full-time employment.  When an Employee elects to take Vacation Time, that Employee is paid his or her regular hourly or salaried rate.  As of the Petition Date, the Debtor has no payment obligation to any Employee on account of accrued Vacation Time.

44.     In addition, all Employees are eligible for sick leave due to illness or injury ("Sick Leave").  Employees may not cash out their unused Sick Leave upon termination.  The Debtor also allows its Employees to take certain other leaves of absence for personal reasons, many of which are required by applicable non-bankruptcy law ("Leaves of Absence").  Leaves of

14

Absence include family medical leave, pregnancy, adoption and foster care leave, military leave, jury duty, voting leave, personal leave, and bereavement leave.  Employees are not entitled to cash payments in the event they choose not to take an authorized Leave of Absence.

45.     The Debtor seeks authority to continue and to modify, in the ordinary course of its business, its Vacation Time and Leaves of Absence policies.

46.     As is customary in the case of many businesses of the Debtor's size, the Debtor utilizes the services of several professionals and consultants in the ordinary course of its business to facilitate the administration and maintenance of its books and records in respect of the Employee Benefit Programs and the qualified pension plan.  Among other things, Hewitt Associates, LLC has provided pension plan actuarial services to the Debtor, Towers Watson has provided market analysis and guidance with respect to compensation issues, and M&I Institutional Trust Services has provided services as pension trustee.  As of the Petition Date, the Debtor estimates it owes Hewitt Associates, LLC $20,000 and M&I Institutional Trust $2,500 on account of services provided prior to the Petition Date.

47.     The Debtor requests that it be authorized to continue to pay third parties to maintain and provide services relating to the Employee Benefit Programs and the qualified pension plan identified in this Motion (even if such third parties are not specifically identified) and to pay any prepetition amounts that may be outstanding as of the Petition Date.

48.     Finally, the Debtor seeks an order authorizing and directing the Debtor's applicable banks, financial institutions, and ADP to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtor related to the Employee Obligations and any amounts held by ADP that have not been transferred to

Employees, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date.

49.    I believe that the relief requested in the Wages Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Wages Motion should be approved.

**D.    Motion for Entry of an Order (A) Establishing an Effective Date for Notice and Sell-Down Procedures for Trading in Claims Against the Debtor's Estate and (B) Granting Related Relief (the "Record Date Motion")**

50.    To preserve the Debtor's ability to formulate a plan of reorganization that maximizes the use of its net operating losses ("NOLs"), the Debtor seeks entry of the Record Date Order establishing an effective date for notice and Sell-Down Procedures (as defined in the Record Date Motion) for trading in claims against the Debtor's estate.  The Debtor may lose the valuable ability to use these NOLs if it experiences an "ownership change" for tax purposes. One way that an "ownership change" for tax purposes may occur is if the Debtor's proposed plan of reorganization entitles any individual to receive more than 4.5% of the equity of the reorganized Debtor.  The Debtor's determination of whether to seek approval of a Sell-Down Order (as defined in the Record Date Motion) will most likely occur once it has formulated a proposed plan of reorganization.  At that time, to avoid irreparable harm, the Debtor may seek authority to compel individuals to sell-down their equity holdings to avoid triggering the 4.5% "ownership change" for tax purposes threshold.  At this stage of this chapter 11 case, it is too early to determine whether it is necessary for the Debtor to obtain a Sell-Down Order. Therefore, in the Record Date Motion, the Debtor seeks only to establish a Record Date that

would be applicable if Sell-Down Procedures are sought later in this chapter 11 case.

Accordingly, I respectfully submit that the Record Date Motion should be approved.

**E.      Motion of the Debtor for Entry of an Order Establishing Notification and Hearing Procedures for Transfers of Certain Common Stock and for Related Relief (the "Equity Trading Motion")**

51.      The Debtor has incurred significant NOLs of approximately $648 million (including losses derived from a worthless stock deduction of approximately $636 million in its 2009 tax year (the "Worthless Stock Deduction")).  The NOLs are valuable because they may be used to offset future taxable income.  While the value of these NOLs is contingent upon whether the Debtor will have sufficient taxable income to use the NOLs before they expire and on the amount of debt cancellation income that the Debtor may realize, the NOLs could translate into potential nominal future tax savings for the Debtor of approximately $100 million, based on a combined federal and state income tax rate of 40%.  Thus, the Debtor's NOLs are an extremely valuable asset of its estate, the availability of which will facilitate the Debtor's successful reorganization and serve to improve creditor recoveries.

52.      I believe that the relief sought by the Equity Trading Motion is necessary to avoid an irrevocable loss of the NOLs and the irreparable harm that would be caused by unrestricted trading in Common Stock and the Debtor's resulting inability to offset taxable income with its NOLs.

53.      I believe that unless the relief requested in the Equity Trading Motion is granted on an immediate basis, the Debtor could be irreparably harmed by the mere filing of the Equity Trading Motion.  If the Debtor filed the Equity Trading Motion in accordance with the usual notice procedures set forth in the Bankruptcy Rules, a flurry of trading in Common Stock could follow.  Parties holding Common Stock could rush to transfer such Common Stock before the

17

restrictions on trading are imposed by this Court.  Unrestricted trading would put the NOLs in

jeopardy and would therefore be counter-productive to the Debtor's objectives in seeking the

relief requested in the Equity Trading Motion.  Accordingly, the Debtor requests that the

procedures described in the Equity Trading Motion be approved immediately on an interim basis

and that a hearing be scheduled within 30 days of the Petition Date to consider approval of the

Equity Trading Motion on a final basis.

54.     I believe that the relief requested in the Equity Trading Motion is in the best

interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the

Debtor to continue to operate its business in chapter 11 without disruption.  Accordingly, on

behalf of the Debtor, I respectfully submit that the Equity Trading Motion should be approved.

## **Procedural Motions**

**F.     Motion of the Debtor for Entry of an Order Establishing Certain Notice, Case
Management, and Administrative Procedures (the "Case Management Motion")**

55.     The Debtor requests that the Court enter an order providing for certain notice,

hearing and other case management procedures in the chapter 11 case.  Given the number of

parties in interest in the chapter 11 case, requiring that service be made upon each of these

parties in all circumstances would waste the Debtor's limited resources.  Thus, I believe that

requiring paper service of certain pleadings only upon the main parties in interest, as well as

authorizing service on all parties by email, will be efficient and save the estate significant time

and expense.  Additionally, due to the likely volume of motions and other pleadings that will be

filed in this case, the Debtor has proposed that such special hearing procedures be created,

including the creation of regularly scheduled omnibus hearings at which the Court, the Debtor,

and other main parties in interest can address several motions at once, thereby avoiding the

substantial time and expense of scheduling separate hearings on each discrete matter.

K&E 16718176

56.     I believe that the relief requested in the Case Management Motion is in the best interests of the Debtor's estate, the creditors, and all other parties in interest and will enable the Debtor to continue to operate its business in chapter 11 without disruption.   Accordingly, on behalf of the Debtor, I respectfully submit that the Case Management Motion should be approved.

**Professional Retention and Compensation**

**G.     Application for Entry of an Order Authorizing the Debtor to Employ and Retain BMC Group, Inc. ("BMC") as Notice, Claims, and Balloting Agent (the "BMC Retention Application")**

57.     The Debtor may have more than 550 potential creditors and holders of equity interests in this chapter 11 case.   Given the Debtor's staffing constraints, I do not believe the Debtor can effectively and efficiently perform certain administrative duties required under chapter 11, such as providing notice of the filing of the Debtor's chapter 11 case and other developments to creditors and other parties in interest, maintaining the claims register, and administering plan voting.   I believe that engaging BMC as professional notice, claims, and balloting agent, will be significantly more cost-effective and free up the Debtor to focus on other aspects of its chapter 11 case.   BMC has developed efficient and cost-effective methods in its area of expertise.   I am of the opinion that BMC is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in the chapter 11 case and, therefore, respectfully submit that the BMC Retention Application should be approved.

K&E 16718176

**H.** **Application for Entry of an Order Authorizing the Employment and Retention of Kirkland & Ellis LLP as Attorneys for the Debtor and Debtor In Possession *Nunc Pro Tunc* to the Petition Date (the "K&E Retention Application")**

58.     The Debtor seeks to retain Kirkland & Ellis LLP ("K&E") as its restructuring attorneys.  K&E has extensive experience and knowledge in and an excellent reputation for providing high quality legal services in the field of debtor protections, creditor rights and business reorganizations under chapter 11 of the Bankruptcy Code.  In preparing for the chapter 11 case, K&E has become familiar with the Debtor's business and the legal issues that may arise in this case.  I believe that K&E is well qualified and uniquely able to represent the Debtor in the chapter 11 case and respectfully submit that the K&E Retention Application should be approved.

**I.** **Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Plante & Moran, PLLC as Independent Auditors and Accountants For the Debtor *Nunc Pro Tunc* to the Petition Date (the "Plante & Moran Retention Application")**

59.     The Debtor seeks to retain Plante & Moran, PLLC ("Plante & Moran") as its auditors and accountants based upon, among other things, Plante & Moran's considerable expertise and Plante & Moran's prior auditing and accounting work.  I believe that Plante & Moran is well qualified to perform the auditing and accounting services needed by the Debtor and respectfully submit that the Plante & Moran Retention Application should be approved.

**J.** **Application for Entry of an Order Authorizing the Employment and Retention of Kinetic Advisors LLC as Financial Advisor for the Debtor and Debtor In Possession *Nunc Pro Tunc* to the Petition Date (the "Kinetic Retention Application")**

60.     The Debtor seeks to retain Kinetic Advisors LLC ("Kinetic") as its financial advisor because, among other things, (a) the Debtor's need to retain a financial advisory firm to provide advice with respect to the Debtor's restructuring efforts and (b) Kinetic's professionals have experience and an excellent reputation in providing financial advisory services in complex restructurings.  Kinetic has been working with the Debtor since June 15, 2009 with respect to

20

various restructuring and other related matters.  I believe that Kinetic is uniquely qualified to

address the complex financial issues that the Debtor is likely to confront during the chapter 11

case and respectfully submit that the Kinetic Retention Application should be approved.

K&E 16718176

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By:     */s/ Randy P. Curtis*

Name:   Randy P. Curtis

Title:    President and Chief Executive Officer

K&E 16718176